UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| DANIKA HARTWELL, | ) | |
|   Individually and on behalf of a class | ) | C.A. NO. 1:18-CV-11895-DJC |
|   of persons similarly situated, | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICREDIT FINANCIAL SERVICES, | ) | |
| INC. d/b/a GM FINANCIAL, | ) | |
| | ) | |
|       Defendant. | ) | |

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## I.  INTRODUCTION

After repossessing Ms. Hartwell's and other putative class members' vehicles,

Americredit Financial Services, Inc. d/b/a GM Financial ("GM") sent them form post-

repossession notices that violated the Massachusetts Uniform Commercial Code ("UCC").

Specifically, GM failed to inform consumers how their deficiency or surplus would be calculated

if it sold their vehicles. The UCC mandates that creditors inform debtors that if they choose not

to redeem a repossessed vehicle, they will be credited the fair market value of the vehicle and not

simply what the creditor sells it for. This is critical information that the law requires that a debtor

receive within a limited time window to have the chance to make a rational decision regarding

redemption or surrender of collateral before it is sold.

GM's violation arises from incorrectly applying two statutes that govern the repossession

and disposal of vehicles in the Commonwealth: the Massachusetts Retail Installment Act

("RISA") and the UCC.  The RISA permits lenders to repossess and sell repossessed vehicles

and then to bring suit for a loan deficiency.  But, in calculating any applicable deficiency, the

1

RISA requires that lenders apply the car's "fair market value" to the consumer's loan balance – not just the sale proceeds.

The UCC requires that the lender send the consumer a notice of the planned sale which informs the consumer, among other things, the manner in which the lender will calculate any deficiency on the consumer's loan after the sale. The UCC calculates deficiencies differently than RISA – the UCC allows application of the sales proceeds from a "commercially reasonable" sale rather than the "fair market value" to the consumer's loan balance.

But, the RISA displaces the UCC with respect to calculating deficiencies, so the pre-sale notice must conform with the RISA's requirement and explain that any deficiency will be calculated by applying the fair market value of the vehicle to the loan balance. This was explained recently by the Supreme Judicial Court in *Williams* v. *Am. Honda Fin. Corp.*, 479 Mass. 656, 668 (2018) (holding that a pre-sale notice that fails to inform a debtor of the fair-market-value credit is "never sufficient" under the UCC).

GM's pre-sale notices failed to comport with this plain-text application of the UCC. Yet, in an effort to avoid liability for its unlawful notices, GM seeks dismissal on three grounds, none of which have merit.

First, GM argues that it should not be accountable for its unlawful notices because the Supreme Judicial Court's holding in *Williams* should not apply retroactively. This argument fails because decisional law is almost always applied retroactively save for extraordinary circumstances where the decision: (1) establishes a new rule not clearly foreshadowed; (2) does not further the rule; and (3) inequitable results, or injustice or hardships, will occur as a result of retroactive application.

The circumstances here are not extraordinary.  First, the *Williams* decision creates no new law – it only confirms existing law that other lenders (such as JP Morgan Chase) routinely complied with before *Williams* was decided.  Second, assuming there is a new rule, retroactive application is warranted because doing so bolsters the consumer protections underpinning the UCC.  Moreover, GM has failed to identify any legal hardship in complying with the existing law.  Therefore, the *Williams* decision should be applied to this case.

Second, GM contends that applying the holding in *Williams* retroactively would violate its due process rights.  This argument is again without merit.  First, due process is only implicated where the statute in question is vague.  But, as the SJC demonstrated by applying the plain text of the UCC in conjunction with the RISA, the statute is not vague.  The RISA expressly states that its provisions displace any differing provisions in the UCC.  M.G.L. c. 255B(d).   GM simply failed to piece the two statutes regulating its self-help repossession conduct together with respect to its pre-sale notices. GM's claimed ignorance of the law is does not excuse its failure.  As mentioned above, numerous lenders in Massachusetts complied with the statute <u>before</u> the SJC's ruling in *Williams*.  Moreover, it is clear that GM *itself* understood the relationship between the RISA and the UCC prior to *Williams* given that it sent Ms. Hartwell a post-sale notice that accurately indicated that her alleged loan deficiency was calculated by applying the fair market value of her vehicle to her loan balance.  It simply failed to do so when the required information was most needed: while debtors had a window to decide to try to redeem their vehicles or let them go. Thus, GM cannot credibly rely on due process as a defense.

Finally, GM contends that Ms. Hartwell fails to assert any cognizable injury sufficient to support a claim under 93A.  This argument, too, fails.  By sending pre-sale notices that did not accurately describe how a deficiency would be calculated, GM deprived Ms. Hartwell and other

class members of the opportunity to make a rational, informed decision with the correct inputs regarding whether or not to redeem their vehicle prior to the sale.  This caused debtors detriment which is cognizable as injury under Chapter 93A.

For these reasons, the Court should deny GM's motion to dismiss on all counts.

## II.  **BACKGROUND**

On or around April 13, 2015, Ms. Hartwell entered into a retail installment sales agreement (the "Agreement") with MAG Motors d/b/a Metro Kia ("Metro") for the purchase of a 2013 Dodge Dart (the "Vehicle").  Amended Complaint (the "Complaint"), ¶ 5; Exhibit A, Agreement.  Sometime thereafter, Metro assigned the Agreement to GM.

On or about April 5, 2018, GM caused the Vehicle to be repossessed.  Complaint, ¶ 9. Shortly thereafter, on April 9, 2018, GM sent Ms. Hartwell a notice (the "Repossession Notice") advising her of the repossession and of its intent to sell the vehicle. *See* Exhibit B, Repossession Notice.

The Repossession Notice failed to comply with the UCC by failing to advise Ms. Hartwell that the fair market value, rather than the sale price, would be deducted from the amount she owes on the loan as required by Massachusetts law, instead stating: "[t]he money from the sale of this vehicle, less any expenses incurred by [GM] may reduce or or increase the amount you owe." *Id.*; Complaint, ¶ 11.

Thereafter, on May 29, 2018, GM sent Ms. Hartwell a notice that it sold her vehicle. *See*, Exhibit C, Post-Sale Notice.  This time, however, GM included the correct standard as to how it would calculate the deficiency on her loan balance, subtracting the "[g]reater of resale proceeds … **or Fair Market Value calculated in accordance with Massachusetts Law**" from the unpaid loan balance. *Id.* (emphasis added).

### III.   ARGUMENT

**A.    Standard of Review**

Fed. R. Civ. P. 8(a) requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief."  A motion to dismiss should be denied if a plaintiff has shown a "plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [a cause of action]." *Id*. at 556.

**B.    The Williams Decision Applies Retroactively**

> **i.   GM Fails To Allege Any "Extraordinary" Circumstances Precluding Retroactive Application.**

GM argues that this Court should limit the holdings of *Williams* only to repossession notices sent <u>after</u> *Williams* was decided.  This is inconsistent with SJC decisions regarding retroactive application of decisional law.  "Decisional law is generally applied 'retroactively' to past events." *Schrottman v. Barnicle,* 386 Mass. 627, 631 (1982) (citation omitted).  The "retroactive application of decisional law provides the necessary incentive to those aggrieved to press for change and improvement in law, and is consistent with the institutional duty of courts to resolve disputes brought before them." *Id*.

It is rare for courts to depart from this basic tenet and apply a decision <u>only</u> prospectively, and a prerequisite to such a departure is that the decision contain a new rule.  Indeed, "in **exceptional circumstances**, when determining whether a **new rule** arising from decisional law should apply [only] prospectively, [courts] look at three factors: (1) whether a new principle has been established whose resolution was not clearly foreshadowed; (2) whether retroactive application will further the rule; and (3) whether inequitable results, or injustice or hardships,

will be avoided by a holding of nonretroactivity." *Dever v. Ward*, 92 Mass.App.Ct. 175 (2017)

(citation and internal quotations omitted) (emphasis added).

First, in its holding, the SJC did not create any new law or a novel rule.  Instead, it merely

restated an existing rule – that repossession notices must accurately describe a consumer's

potential liability for a deficiency by stating that any deficiency will be calculated based on the

fair market value of the consumer's vehicle.  The SJC's decision is the result of a plain-text

reading of the UCC and the RISA.

The UCC, G. L. c. 106, §§ 9–600, generally governs defaults in secured transactions.

UCC § 9-614 provides that, after the repossession of collateral but before its sale, a lender must

send the consumer a written notice containing critical information regarding the process,

including a "description of any liability for a deficiency of the person to which the notification is

sent."  UCC § 9-614(1).  The statute creates a safe harbor provision for any repossession notice

that states, among other things:

> [t]he money that we get from the sale (after paying our costs) will reduce the amount you
> owe. If we get less money than you owe, you (*will or will not, as applicable*) still owe us
> the difference.  If we get more money than you owe, you will get the extra money, unless
> we must pay it to someone else.

UCC § 9-614(3).

Notably, "the Uniform Commercial Code calculates deficiencies using the proceeds of a

'commercially reasonable' sale."  *See Williams*, at 668, citing G. L. c. 106, § 9–615.

In contrast, the Massachusetts Retail Installment Sales Act, M.G.L. c. 255B, §§ 20B, 20A

(hereinafter, "RISA"), which applies to retail installment sales of vehicles, provides that,

"[u]nless displaced by the provisions of this section [RISA § 20B] and section twenty A [RISA §

20A] the rights and obligations of the parties, including the redemption and disposition of the

collateral shall be governed by the provisions of Part 6 of Article 9 of chapter 106."  RISA §

20B(d).  In turn, RISA § 20B(e)(1) provides that:

> "[i]f the unpaid balance of the consumer credit transaction at the time of default was two
> thousand dollars or more the creditor shall be entitled to recover from the debtor the
> deficiency, if any, resulting from deducting the fair market value of the collateral from
> the unpaid balance due and shall also be entitled to any reasonable repossession and
> storage costs, provided he has complied with all provisions of this section."

In other words, "General Laws c. 255B, § 20B, calculates the deficiency using the fair market

value of the vehicle, whereas the Uniform Commercial Code calculates deficiencies using the

proceeds of a 'commercially reasonable' sale."  *Williams*, at 668 (citing G. L. c. 106, § 9–615).

And "[b]ecause the Uniform Commercial Code and G. L. c. 255B, § 20B, calculate deficiencies

differently, the use of the Uniform Commercial Code safe harbor language is inconsistent with

Massachusetts law."  *Id*. at 668-69.  Therefore, "[t]he notice that is required by G. L. c. 106, § 9–

614, and G. L. c. 106, § 9–616,[1] must describe the deficiency as the difference between the fair

market value of the collateral and the debtor's outstanding balance because this is what is

required by § 20B."  *Id*. at 669.

The *Williams* decision stands for something simple: the provisions of UCC § 9-614 do

not exist on an island and must be read with RISA, so a notice sent under UCC § 9-614 is

sufficient only when it informs the debtor that any loan deficiency will be calculated based on

the fair market value of the vehicle and not the proceeds from the sale of the vehicle.  *See*

*Williams*, *supra* at 669.  The SJC's decision simply confirmed this plain-text approach to

interpreting both the relevant statutes, holding "that the notice that is required by the Uniform

Commercial Code is **never sufficient** where the deficiency is not calculated based on the fair

market value of the collateral ***and*** the notice fails to accurately describe how the deficiency is

---

[1] Section 9-616 requires that notice be provided to the consumer after the sale of their collateral.  The notice must describe, among other things, a description of any deficiency the consumer may owe.

calculated." *Williams*, 479 Mass. at 668 (emphasis added).  The "fair market value" credit a debtor is owed after his car is repossessed is found only in the RISA and not in the UCC, yet the SJC reminded lenders that turning a blind eye to the requirements of the RISA while parroting the language of the UCC is "never" sufficient.  *Id*.

One of the core obligations imposed on lenders under RISA § 20B is that the creditor is entitled to recover the deficiency, if any, resulting from deducting the fair market value of the collateral from the unpaid balance due.  The court in *Williams* highlighted the obvious – that this obligation carries over to the post-repossession notice, as the notice must accurately describe how the deficiency is calculated.  *See Williams, supra*.  Indeed, "[a]ny doubt on this issue was resolved in 2001, when the Legislature made explicit that it intended to displace the UCC in this respect, adding to § 20B the language, "[n]otwithstanding the provisions of [UCC, G. L. c. 106, §§ 9–601 to 9–628]."  *Williams*, 479 Mass. at 678 (C.J. Gants, dissenting).

This was not a surprising result.  Indeed, lenders routinely complied with this rule <u>before</u> the June 2018 decision in *Williams*, demonstrating that lenders understood the rule before the SJC's ruling.  *See*, *e.g.*, <u>Exhibit D</u>, JP Morgan Chase Bank, Repossession Notice, June 9, 2017 ("[s]tate law requires we apply the greater of actual sales proceeds and the Vehicle's fair market value to reduce (or cancel in some cases) your obligation"); <u>Exhibit E</u>, Rockland Federal Credit Union, Repossession Notice, February 6, 2018 ("[b]e advised that should the collateral be sold by the Rockland Federal Credit Union, you may be held liable for the payment of any unpaid balance plus repossession and storage costs (after applying the fair market value of the collateral to your loan balance."); <u>Exhibit F</u>, Exeter Finance, Repossession Notice, January 27, 2017 (deficiency calculated by subtracting the "[h]igher of (a) gross proceeds from the sale of the Vehicle or (b) fair market value of Vehicle" from net balance due).

In fact, GM's own post-sale notice demonstrates that it understood that the RISA and the UCC must be read together when repossessing and selling a consumer's vehicle.  In the post-sale notice GM sent to Ms. Hartwell, it accurately described Ms. Hartwell's post-sale deficiency as subtracting the "[g]reater of resale proceeds … **or Fair Market Value calculated in accordance with Massachusetts Law**" (emphasis added).  *See*, <u>Exhibit C</u>, Post-Sale Notice.  Given that the "fair market value" credit is found only in the RISA and the post-sale notice requirements are found only in the UCC, GM plainly understood the interplay between the two statutes.  Accordingly, GM's argument that the holding in *Williams* presented some unforeseen clarification of the existing rule under both the UCC and RISA §§ 20A and 20B falls flat.  Given that there was no new rule, and the existing rule was commonly understood not only by other lenders across the Commonwealth but by GM itself, any question over whether the decision should apply <u>only</u> prospectively ends.

But, even were the *Williams* decision a new rule, retroactive application would be appropriate because it would further the purposes of the statute.  "Sections 9-614 and 9-616 [of the UCC] continue the expansion of consumer-oriented rules in the Code.  The thrust of these uniform provisions is to advance the notion of communications to the debtor, which are informative and helpful, as well as consumer friendly, in consumer dispositions."  *See* Herbert Lemelman, Massachusetts Practice Series: Manual on Uniform Commercial Code, 25A Mass. Prac. § 9:234 (ed ed.)

The import of the SJC's holding in *Williams* is that a notice sent under UCC § 9-614 is sufficient only when it informs the debtor that any loan deficiency will be calculated based on the fair market value of the vehicle and not what a lender may fetch for it at a dealer auction or private sale.  This is vital information for a debtor weighing his or her options after a

repossession, as gauging the size of the potential amount of post-repossession debt is key for deciding whether to redeem or surrender a vehicle.  A fair market value credit is not only knowable via a Google search but likely to be larger than what may actually be obtained via a range of possible real-world disposition methods.  Therefore the *Williams* decision furthers the purpose of the RISA and UCC in providing consumers with some measure of transparency at a time when their property has been seized by a creditor using self-help repossession outside the supervision of a court. *Osborne v. Minnesota Recovery Bureau, Inc.***,** No. 04–1167(JRT/FLN), 2006 WL 1314420, at *2 (D. Minn. May 12, 2006) (applying strict construction of UCC provision because "self-help repossession is a harsh remedy" and "strict application of the law is necessary to prevent abuse and to discourage illegal conduct") (citation omitted).

Third, no injustice or hardship will befall GM by retroactively applying *Williams*.  GM has provided no reason why compliance with the notice requirements under Massachusetts law presents an undue hardship.  GM need only change the text of its form repossession notices in order to comply with the law.  As noted above, lenders across the Commonwealth were able to do this before the *Williams* decision without issue.  And if GM had simply informed consumers of their RISA fair market value crediting rights in its pre-sale UCC notices like it did in its post-sale notices, it would have complied with the law.  Thus, there should be no exception here to the general principle that decisional law applies retroactively.

### ii.  GM's Reliance On Eaton v. FNMA Is Misplaced.

GM relies heavily on the SJC's holding in *Eaton v. FNMA*, 462 Mass. 569 (2012) to claim that retroactive application here is inappropriate.  GM is wrong.  In *Eaton*, the SJC interpreted the term "mortgagee" under a Massachusetts statute to mean that a mortgagee must hold both the mortgage <u>and</u> the note in order to effectuate a foreclosure.  462 Mass. at 588.  Prior to its decision, lenders and attorney had relied on an interpretation of the term "mortgagee" that

instead "require[d] the mortgagee to hold only the mortgage, and not the note, in order to effect a valid foreclosure by sale." *Id*. at 588.  The SJC was warned that, if applied retroactively, the decision would "wreak havoc with the operation and integrity of the title recording and registration systems by calling into question the validity of any title that has a foreclosure sale in the title chain." *Id*. at 586.

Considering the impact of the decision, the SJC noted that "when [it] construe[s] a statute, [it] do[es] not engage in an analysis whether that interpretation is given retroactive or prospective effect; the interpretation [it] give[s] the statute usually reflects the court's view of its meaning since the statute's enactment." *Id*. at 587.  However, the SJC, acknowledging that retroactive application of its decision would upend the Commonwealth's entire property recording system, decided to apply its decision only prospectively, citing the "significant difficulties in ascertaining the validity of a particular title if the interpretation of 'mortgagee' that we adopt here is not limited to prospective operation, because of the fact that our recording system has never required mortgage notes to be recorded." *Id.*

In sum, the SJC's concern in *Eaton* was that retroactive application would throw a wrench into deciphering the chain of title of thousands of mortgages across the Commonwealth. In effect, by redefining the term "mortgagee" to be the person or entity that holds both the mortgage and the note secured by the mortgage, the SJC threatened to rupture the entire housing and foreclosure markets, which at the time were built around the notion that an individual or entity only needed to hold the mortgage in order to effectuate a valid foreclosure sale.  As a result, retroactive application of its holding in *Eaton* would call into question not only the validity of countless prior foreclosures and subsequent sales of homes, but also the very chain of title on which current owners of these homes now rely.

11

The holding and reasoning from *Eaton* is not applicable here.  First, the SJC did not indicate that its decision in *Williams* would only apply prospectively, as it did in *Eaton*. This was sensible, as none of the exceptional circumstances in *Eaton* are present here.  As noted above, *Williams* did not provide any novel interpretation of a defined term or existing statute.  Instead, it merely confirmed that the RISA and the UCC must be read together in determining what constitutes a lawful post-repossession notice in accordance with the plain text of the statute and the intent of the Massachusetts legislature.  *See Williams*, 479 Mass. at 678 (C.J. Gants, dissenting) ("[a]ny doubt on [whether the Massachusetts legislature intended to displace the UCC provisions governing deficiency liability] was resolved in 2001, when the Legislature made explicit that it intended to displace the UCC in this respect, adding to [RISA] § 20B the language, '[n]otwithstanding the provisions of [UCC, G. L. c. 106, §§ 9–601 to 9–628]' ").

Furthermore, applying *Williams* retroactively would not upend the entire auto-loan market by calling into question the validity of countless prior repossessions, which rest on the fact that a consumer-debtor defaulted on his or her obligations under their car loan, or any subsequent dispositions of such vehicles.  In stark contrast, had *Eaton* been applied retroactively, lenders' rights and interests with respect to countless properties would be subject to dispute.

Here, retroactive application of *Williams* would only further the purpose of the statute by holding lenders accountable for misleading consumers on how the deficiency on their loan would be calculated.  Accordingly, because *Williams* in no way invades the lender's right to repossess, retain, or otherwise assert and effectuate its security interest in the vehicle, the SJC's holding in *Eaton* does not apply here.

### iii.   GM's Due Process Rights Are Not Implicated, As the Statute Is Not Vague.

GM argues that that the retroactive application of *Williams* would violate GM's due process rights on account of vagueness.  A law is void for vagueness if persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Smith v. Goguen*, 415 U.S. 566, 572 n. 8 (1974), quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).  Vague laws violate due process because individuals do not receive fair notice of the conduct proscribed by a statute, *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972), and because vague laws that do not limit the exercise of discretion by officials allow for possible arbitrary and discriminatory enforcement.  *Grayned v. Rockford*, 408 U.S. 104, 108–109 & n. 4, (1972).

"[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.*  Moreover, "outside of the realm of the first amendment, vagueness challenges are 'judged on an as-applied basis.' " *U.S. v. Bay State Ambulance and Hosp. Rental Service, Inc.*, 874 F.2d 20

Here, GM's contention that both the RISA and the UCC were "vague" prior to the court's decision in *Williams* fails for the same reasons that *Williams* applies retroactively in the first place. The plaint-text approach taken by the SJC in *Williams* belies the assertion that GM would have had to "guess at the meaning" of the RISA and the UCC.  *See Smith v. Goguen*, supra, at 566, 572 n. 8.  Indeed, the relevant portions of RISA and the UCC existed long before the

decision in *Williams* and were commonly understood by lenders in the Commonwealth prior to *Williams*. *See, e.g.*, <u>Exhibit D</u>, JP Morgan Chase Bank; <u>Exhibit E</u>, Rockland Federal Credit Union; <u>Exhibit F</u>, Exeter Finance.

Moreover, the plain meaning of the statutes precludes any notion that GM would be subject to any unfair surprise by the enforcement of GM's violation of the UCC.  The text of the UCC and RISA make clear that certain provisions of the UCC have been displaced by RISA §§ 20A and 20B, including UCC § 9-614.  Therefore, the statute is not unconstitutionally vague.

C.    **GM's Willful Violation of The UCC and RISA Constitutes Is In-Itself A Violation of 93A, Which Harmed Ms. Hartwell By Depriving Her Of The Opportunity To Make An Informed Choice In Deciding Whether Or Not To Redeem Her Vehicle Prior To Its Disposition**

i.    <u>**A Willful Violation of UCC 9-614 and RISA Is An Unfair and Deceptive Practice**</u>

Section 2 of Chapter 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a practice violates Chapter 93A, courts look to "(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593 (1975) (quotations omitted).  "Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of 93A § 2 if … it fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection."  940 Code Mass. Regs. § 3.16(3)

Here, the consumer protection provisions of the UCC and RISA, which include the notice requirements violated by GM as described herein, are existing statutes, rules, regulations, or laws, meant for the protection of the public health, safety, or welfare promulgated by the Commonwealth within the meaning of 940 Code Mass. Regs. §3.16(3).  As set forth above, the UCC is designed to protect consumers by ensuring vital communications during the disposition of their property.  *See* Herbert Lemelman, Massachusetts Practice Series: Manual on Uniform Commercial Code, 25A Mass. Prac. § 9:234 (ed ed.).  And violating the RISA is a *per se* violation of Chapter 93A.  *See* M.G.L. c. 255, § 6 ("A violation of this chapter shall also be a violation of chapter ninety-three A"); *see also Williams*, 479 Mass. at 678 (C.J. Gants, dissenting) (Section 20B of the RISA was "intended broadly to protect the rights of consumers broadly and, more specifically, to protect consumers from potential abuse by creditors who would repossess their vehicles, sell them at distressed prices, and then claim large deficiencies").

Accordingly, GM violated 93A § 2 when it sent its unlawful post-repossession notices to consumers across the Commonwealth, including Ms. Hartwell.

### ii.  Ms. Hartwell Suffered A Cognizable Injury Under 93A

In order to have standing to sue under Chapter 93A, a consumer must allege that "the violation of [a] legal right that has created the unfair or deceptive act or practice cause[d] the consumer some kind of separate, identifiable harm arising from the violation itself."  *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 503-04 (2013).

Depriving a plaintiff of the correct inputs needed to make a rational decision about an important asset is such a "separate, identifiable harm" within the meaning of Chapter 93A injury law.  *See, e.g., Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 624–25 (2008) (finding that a claim by plaintiffs that the cars they purchased were less safe than was represented or required

by safety standards "would support a cause of action under G.L. c. 93A, § 9"); *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 384 (2004) (holding that purchasers of cigarettes could bring a class action against a manufacturer for falsely claiming that its cigarettes delivered health benefits they did not, in fact, provide). Indeed, depriving consumers of vital information required by statute goes to the very heart of what constitutes an injury under 93A, because it leaves plaintiffs in a worse position than they would have been had they been provided the information required by law. *See Hershenow v. Enter. Rent-A-Car Co. Of Bos.*, Inc., 445 Mass. 790, 800 (2006) (noting that a statutory violation that leaves consumers in a "worse position" than they would have been in had the defendant complied with the requirements of Massachusetts law constitutes an economic injury under 93A).

When GM failed to inform Ms. Hartwell that she would be entitled to a fair-market-value credit if GM sold her car, it materially misstated how her loan deficiency would be calculated. This, by definition, deprived Ms. Hartwell of the chance to make a rational, informed choice about what to do about her vehicle. It is not difficult to see how consumers might make different choices knowing or not knowing the basis of a post-sale credit. *See Hershenow*, *supra*, at 790.

Moreover, a reasonable inference exists that these faulty notices caused Ms. Hartwell and other consumers in Massachusetts to act differently following the repossession of their vehicles, which can form the basis of cognizable injury under Chapter 93A. *See Aspinall*, 442 Mass. at 394 (finding the deceptive advertising regarding health benefits of light cigarettes "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted," and thus causation was established for purposes of establishing an injury under 93A); *Lannan v. Levy & White*, 186 F. Supp. 3d 77, 96 (D. Mass. 2016) (finding an injury in the 93A context where the defendant's wrongful inclusion of undifferentiated

16

prejudgment interest in small claims complaints and the inclusion of prejudgment interest calculated from the date of provision of services were "**likely to have some kind of negative impact on the recipient, particularly in terms of assertion of legal rights or financial decision-making**") (emphasis added), citing *Gathuru v. Credit Control Servs., Inc.*, 623 F.Supp.2d 113, 123 (D.Mass.2009) (finding Chapter 93A injury based on attempted collection of debt amounts not owed).[2]  This is the substance of the injury suffered by Ms. Hartwell.

At bottom, by failing to provide adequate notice of how exactly the deficiency on their loan balances would be calculated, GM is effectively taking advantage of consumers by forcing them to make a decision without being properly appraised of all the relevant information. GM knew the true basis of the sale credit, as it stated that fair-market-value basis in its post-sale notices. Without this information pre-sale, consumers are left in the "worse and untenable" position of having to make an important decision without all of the relevant inputs, while the lender reaps the benefit of this asymmetrical distribution of knowledge.  *See* Complaint, ¶¶ 36-37;  *Tyler v. Michaels Stores, Inc.*, supra, at 503-04.  This is exactly what the court in *Williams* sought to address by making clear "that the notice that is required by the Uniform Commercial Code is **never sufficient** where the deficiency is not calculated based on the fair market value of the collateral ***and*** the notice fails to accurately describe how the deficiency is calculated." *Williams*, 479 Mass. at 668 (emphasis added).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's motion to dismiss should be denied.

---

[2] Even if Ms. Hartwell did not rely on the notice in making her decisions, as GM suggests, it is not fatal to her claim. *See Ferreira v. Sterling Jewelers, Inc.*, 130 F. Supp. 3d 471, 478 (D. Mass. 2015) ("[t]o prove causation of one of these cognizable injuries, a plaintiff 'need not show proof of actual reliance on a misrepresentation in order to recover damages'; instead, the plaintiff must show 'a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception.'") (citation omitted).

Respectfully submitted,

DANIKA HARTWELL,
By her attorneys,

*/s/ Raven Moeslinger*
Raven Moeslinger (BBO# 687956)
Nicholas F. Ortiz (BBO# 655135)
Law Office of Nicholas F. Ortiz, P.C.
99 High Street, Suite 304
Boston, MA 02110
(617) 338-9400
rm@mass-legal.com

Dated: January 18, 2019

## CERTIFICATE OF SERVICE

I, Raven Moeslinger, hereby certify that today I caused to be served the within on counsel

for the defendant via ECF service.

*/s/ Raven Moeslinger*