UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIKA HARTWELL, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

AMERICREDIT FINANCIAL SERVICES,
INC. d/b/a GM FINANCIAL,

Defendant.

NO. 1:18-CV-11895-DJC

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S ASSENTED-TO
MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION
SETTLEMENT AND FOR
CERTIFICATION OF SETTLEMENT
CLASS**

## I. INTRODUCTION

Plaintiff Danika Hartwell ("Plaintiff" or "Ms. Hartwell"), individually and on behalf of

the proposed settlement class, respectfully seeks preliminary approval of the Class Action

Settlement Agreement ("Agreement" or "Settlement") reached with Defendant Americredit

Financial Services, Inc. d/b/a GM Financial ("GMF"). The Settlement requires GMF to establish

a settlement fund (consisting of both cash payments and statement credits) of $2,945,400 and to

provide class members with approximately $8.3 million in deficiency balance forgiveness, a total

settlement value of approximately $11,250,000.

The settlement fund also will be used to pay notice and administration expenses and any

attorneys' fees and costs approved by the Court, capped at 25% of the cash component of the

settlement fund.  GMF will also pay a $5,000 incentive award to Plaintiff.

For the reasons set forth in this memorandum and the supporting documentation, the

Settlement is fair and reasonable. Accordingly, Plaintiff respectfully requests that the Court: (1)

grant preliminary approval of the Settlement; (2) preliminarily certify the proposed class and

subclass; (3) appoint the Law Office of Nicholas F. Ortiz, P.C. as class counsel; (4) appoint Ms.

Hartwell as class representative; (5) approve the proposed form and method of notice to Class Members; (6) appoint Optime Administration LLC to serve as the Claims Administrator; and (7) schedule the fairness hearing and related dates.

## II.  STATEMENT OF FACTS

### A.  Plaintiff Alleges That GMF Violated The Massachusetts Uniform Commercial Code And Consumer Protection Law.

Ms. Hartwell commenced this class action against GMF on behalf of herself and other similarly situated consumers for alleged violations of the Massachusetts Uniform Commercial Code, M.G.L. c. 106, § 9-600, *et seq*.  ("UCC") and Consumer Protection Law, M.G.L. c. 93A, § 2, *et seq* ("Chapter 93A"). Upon a qualifying default, after a secured creditor repossesses a vehicle but before it sells it, that creditor must send the debtor a notice informing her, amongst other things, how the creditor will calculate any post-sale deficiency balance the consumer may owe.  UCC § 9-614(1).  Under Massachusetts law, a consumer's post-sale deficiency balance must be calculated by applying the fair market value of the vehicle (rather than the sale proceeds) to the consumer's outstanding account balance.  M.G.L. c. 255B, § 20B(e)(1).  As such, a post-repossession notice must describe a consumer's potential post-sale deficiency as the difference between her outstanding account balance and the fair market value of her vehicle.

Here, Ms. Hartwell alleges that GMF violated the UCC by sending her and other similarly-situated consumers post-repossession notices that failed to comply with the UCC. Specifically, Ms. Hartwell contends that the post-repossession notices failed to comply with the UCC because they described consumers' potential deficiency as the difference between the sale proceeds--rather than the fair market value--and their outstanding account balance.  Ms. Hartwell further alleges that GMF's use of these post-repossession notices constituted an unfair and deceptive practice within the meaning of Chapter 93A, giving rise to class-wide damages.

**B.** **Procedural History.**

On July 17, 2018, Plaintiff sent GMF a demand letter pursuant to M.G.L. c. 93A, § 9 (the "Demand Letter"), seeking class-wide relief for its alleged violations of the UCC and Chapter 93A. On the same day, the Plaintiff filed a complaint in Bristol County Superior Court, alleging that GMF violated the UCC.

On September 5, 2018, GMF removed the case to this Court. (ECF No. 1) On September 18, 2018, after receiving an extension from Plaintiff, GMF responded to the Demand Letter. Plaintiff subsequently filed a motion to remand on October 5, 2018. (ECF No. 8) The Court denied the motion on November 14, 2018. (ECF No. 13) On November 28, 2018, Plaintiff filed an amended complaint, adding a claim under Chapter 93A. (ECF No. 16) And on December 6, 2018, Plaintiff rejected GMF's settlement offer and made a counter-offer.

On December 28, 2018, GMF filed a motion to dismiss all claims in Plaintiff's Complaint (the "Motion to Dismiss"). (ECF No. 24) Plaintiff subsequently filed an opposition, and GMF filed a reply in support of its motion. (ECF Nos. 26, 27) The Court held a hearing on February 13, 2019. (ECF No. 30) After the hearing, the parties agreed to ask the Court to stay its decision on the Motion to Dismiss to allow them time to engage in further settlement discussions, and filed a Notice of Settlement Negotiations on February 25, 2019. (ECF No. 31) The parties were ultimately able to reach the Settlement that is before this Court on Plaintiff's Assented to Motion for Preliminary Approval of Class Action Settlement and for Certification of Settlement Class ("Motion for Preliminary Approval").

**C.** **Prior To Reaching A Class-Wide Settlement, Plaintiff Thoroughly Investigated The Class' Claims, and The Parties Engaged In Arm's-Length Settlement Negotiations.**

The parties' settlement communications date back to the service of Plaintiff's Demand Letter on July 17, 2018. Therein, Plaintiff demanded that GMF tender class-wide statutory

damages under both the UCC and Chapter 93A, waive the deficiency balance of all class members, and change its notice procedures.  On September 18, 2018, GMF responded by denying all liability and raising a number of defenses (including those that ultimately became part of its Motion to Dismiss).  However, GMF offered to resolve the case on a class-wide basis, but as to a smaller group of consumers than proposed by Plaintiff.  GMF offered to waive the deficiency balances for more than 2,000 accounts and make cash payments to some of those class members.

Following the hearing on GMF's Motion to Dismiss, the parties agreed to continue settlement discussions, and filed a Notice of Settlement Negotiations on February 25, 2019, in which the parties' asked the Court to refrain from ruling on the Motion to Dismiss for a limited period of time.  (ECF No. 31).  In the ensuing weeks, the parties engaged in intensive settlement negotiations.  During this process, GMF's counsel shared with Plaintiff's counsel data regarding the size of the class and the potential damages in the case, including summaries reflecting the amount financed and stated finance charge for each potential class member.[1]  Based on this data, the parties were able to reach the class-wide settlement that is before this Court, which settlement totals approximately $11,250,000 in value to Class Members.

**D.     The Terms of the Proposed Settlement.**

The terms of the parties' proposed Settlement are contained within the Class Action Settlement Agreement (the "Settlement Agreement") attached as Exhibit 1 to the Motion for Preliminary Approval. For purposes of preliminary approval, the following summarizes the Settlement Agreement's terms:

---

[1] Damages under the UCC are defined as 10% of the amount of the principal amount of the obligation, plus the finance charge.  M.G.L. c. 106, § 9-625(c)(2).

1.   **The Settlement Class and Sale Subclass**

The proposed Settlement Class is comprised of:

> All accounts subject to a Retail Installment Contract ("RISC") with respect to which GMF sent a notice identical and/or substantially similar to the notice attached as <u>Exhibit A</u> to Plaintiff's Amended Complaint [Dkt. 16], at any time between July 19, 2014 through July 17, 2018, excluding: (i) any account that includes within the applicable RISC, a provision requiring either party to submit to binding non-class arbitration, (ii) any account an obligor of which received a discharge in bankruptcy after the date he or she received such a notice, and (iii) any account where GMF has previously obtained a binding release from all obligors or obtained a judgment against all obligors;

The Settlement Agreement also contains a proposed subclass (the "Sale Subclass") consisting of all accounts within the Settlement Class where GMF repossessed or accepted voluntary surrender of the subject vehicle and then sold, leased, licensed or otherwise disposed it without sending a presale notice that included the phrase "fair market value" prior to such sale or other disposition.[2]

The proposed Settlement Class does not include any persons who validly request exclusion from it. The parties believe and GMF's records confirm there are approximately 3,909 Settlement Class members.[3]

2.   **The Settlement Relief**

The Settlement Agreement requires GMF to pay or credit a total of $2,945,400 for the Settlement (the "Settlement Money"), consisting of both cash payments and account credits to Class Members.  Agreement, ¶ 4.3.  The Settlement Agreement also requires GMF to waive Class Members' deficiency balances, which balances total approximately $8.3 million.  The Settlement Money will be used to pay *each* Settlement Class Member a cash award or to give

---

[2] As set forth below, this subclass is critical, as it separates those with relatively weaker claims under the UCC (those class members whose vehicles were <u>not</u> sold by GMF) from those with stronger claims (those whose vehicles <u>were</u> sold).

[3] The parties have agreed that if the number of class members within the Sale Subclass increases by more than 5%, GMF will pay an additional, proportional amount to account for the additional class members.  *See* Agreement, ¶ 5.1.

statement credit of $150.  The Sale Subclass, consisting of Settlement Class Members whose vehicles were sold (which, as explained below, has stronger claims), will receive additional cash payments proportionate to their alleged damages under the UCC.  Plaintiff estimates that, after deduction of proposed attorneys' fees and costs and estimated administration costs, these additional payments will average approximately $712 per Sale Subclass member.  These sums will be distributed by the class administrator.

       3.      **Plaintiff's Incentive Award**

Plaintiff will ask the Court to approve an incentive award of $5,000 for Ms. Hartwell, to be paid separately from the Settlement Fund.  Agreement, ¶ 4.4. This award will compensate Plaintiff for her time and effort serving as class representative and for the risks she undertook in prosecuting the case.  GMF will make this payment separate and apart from the Settlement Fund.

       4.      **Attorneys' Fees and Litigation Expenses**

The Settlement Agreement provides that Plaintiff's counsel may request that the Court approve an award of attorneys' fees and litigation expenses. *Id.*, ¶ 4.5.  Plaintiff's counsel expects to file a fee petition with the Court requesting an attorneys' fees award of 25% of the Settlement Fund ($736,350), or 6.5% of the total settlement value, to compensate and reimburse them for the work already performed in this case, the work remaining to be performed in connection with the Settlement, and for the risk associated with prosecuting this case on a contingent-fee basis.

Plaintiff believes that this amount reasonably reflects the award of attorneys' fees granted in First Circuit cases, as it falls within the established "bench mark" for class settlements that result in a common fund.

       5.      **Administration Costs**

The parties have agreed that a third-party settlement administrator will administer the settlement. The parties estimate that administration costs will total approximately $30,000.00, which will be deducted from Settlement Fund. The administrator's duties will include updating addresses in the Class List, preparing and mailing notice, fielding questions from Settlement Class Members regarding the settlement, processing opt-outs, and issuing checks to all members of the Settlement Class who do not opt-out. Agreement, ¶¶ 5.2, 6.2, 7.3.

6. **Settlement Administration and Notice**

The Settlement calls for notice to be sent by first-class mail by the Settlement Administrator within ten (10) business days after the Court preliminarily approves the Settlement and GMF provides a class list. Agreement, ¶ 7.2. The Class Settlement Notice will set a deadline to opt-out of the class.

## III. ARGUMENT

A. **The Settlement Approval Process.**

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action settlement must be approved by the Court. A court should approve a class settlement when it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Manual for Complex Litigation describes a three-step procedure for approval of class action settlements: (1) preliminary approval of the proposed settlement; (2) dissemination of notice of the settlement to all affected class members; and (3) a "fairness hearing" or "final approval hearing," at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented. *Manual for Complex Litigation (Fourth)* ("MCL 4th") §§ 21.632 – 21.634, at 430–31 (2015).

At the preliminary approval stage, "the court can only determine whether the proposed settlement appears to fall within the range of possible final approval." *Trombley v. Bank of America Corp.*, No. 08–cv–456–JD, 2011 WL 3740488, at *4 (D. R.I. Aug. 24, 2011).  As one court has observed, "[t]his determination is similar to a determination that there is 'probable cause' to think the settlement is fair and reasonable." *Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 273 (N.D. Cal. 1976).

When reviewing the reasonableness of a settlement, courts consider the "strong public policy in favor of settlements," *P.R. Dairy Farmers Ass'n v. Pagan*, 748 F.3d 13, 20 (1st Cir. 2014) (internal quotations omitted), particularly in class action litigation. *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007)

As set forth in detail below, Plaintiff submits that the proposed Settlement falls well within the "range of possible final approval."

**B.     The Settlement Should Be Preliminarily Approved, As It Is Within The Range Of Possible Final Approval.**

     1.     <u>The Settlement Is The Product Of Informed And Arm's Length Negotiations</u>

"Where the parties have negotiated a settlement at arms'-length and have conducted sufficient discovery, the settlement is entitled to a presumption of reasonableness." *Hill v. State Street Corp.*, No. 09–12146–GAO 2015 WL 127728, at *7 (D. Mass. Jan. 8, 2015), citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32–33 (1st Cir.2009).

Here, the parties engaged in arms-length negotiations over the course of several months, dictated in part by the settlement-encouraging demand process set forth in Chapter 93A.[4]

---

[4] Prior to instituting a claim under Chapter 93A, the law requires a consumer to send a demand letter outlining her claim and requesting relief.  M.G.L. c. 93A, § 9.  This procedure is designed to encourage the parties to reach a settlement, as it penalizes the recipient of the letter for failing to make an appropriate offer of settlement.  *See International Fid. Ins. Co. v. Wilson*, 387 Mass. 841, 857 (1983) (citation omitted) ("[i]ndeed, the conduct proscribed by the Statute is as much the failure to make a reasonable

Plaintiff made an initial class-wide settlement demand in her Demand Letter in July 2018, requesting that GMF pay class-wide damages under the UCC and Chapter 93A and to forgive the class' loan deficiencies.  GMF responded with a class-wide settlement offer on September 18, 2018, offering to resolve the case on a limited, class-wide basis.  The parties continued to negotiate, but did not reach an accord at that juncture.  GMF then filed its Motion to Dismiss. (ECF No. 24)

After the Court heard oral argument on GMF's Motion to Dismiss, the parties again returned to negotiating a class-wide settlement.  During this process, Plaintiff's counsel requested, and GMF's counsel provided, summaries of all of the information Plaintiff needed to determine the size of the class and the potential damages.  Ultimately, as a result of these arm's length negotiations, the parties reached the class-wide settlement that is before this Court, which totals approximately $11,250,000 in value.

The parties' adversarial position throughout the course of this litigation – both in settlement communications and motion practice – reflect that the settlement was the result of an arm's length negotiation conducted by experienced counsel and therefore should be found presumptively reasonable.  *See, e.g.*, *Scott v. First American Title Ins. Co.*, No. 06–cv–286–J, 2008 WL 2563460, at *2-3 (D.N.H. Jun. 24, 2008) (preliminarily approving class settlement, reasoning that filing and opposing two motions to dismiss and a motion to remand before reaching settlement reflected that the parties were "adversaries from [the litigation's] inception" and therefore that the agreement was reached through arms-length negotiation).

---

settlement offer as it is the substantive violation of c. 93A. Multiple damages are the 'appropriate punishment' for forcing Plaintiff and other similarly situated individuals to litigate clearly valid claims).

2.    **The Settlement Provides Substantial Benefits To Class Members, And The Division Of Monetary Settlement Payments Is Reasonable**

The Settlement Agreement requires GMF to pay cash payments or provide account credits of approximately $2,945,400 and to provide $8.3 million in deficiency balance forgiveness, a total value of $11,250,000.  In comparison, the potential damages under the UCC for the Settlement Class are approximately:  $17.5 million for individuals whose vehicles were not sold or were sold after GMF sent a later presale notice that included the phrase "fair market value"; and $26.8 million for individuals whose vehicles were sold.  This distinction – between class members' vehicles that were sold and not sold – is critical for understanding why the Settlement Agreement provides a different amount of the benefits to the group of individuals whose vehicles were sold.

The UCC provides that "a secured party ***that disposes of collateral*** under Section 9-610 shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition." M.G.L. c. 106, § 9-611(b) (emphasis added).  The content of this notice (which is the subject of this lawsuit) is contained in Section 9-614 of the UCC.  In short, Section 9-610 could be interpreted to mean that a secured creditor's responsibility for sending a sufficient post-repossession, pre-sale notice only arises if the creditor actually sells or otherwise disposes of the vehicle.

Plaintiff's view is that this interpretation is wrong, as the purpose of the pre-sale notice is to give the consumer an opportunity to redeem their vehicle by, for example, attending a public auction at which their vehicle is to be sold, and understanding the basis of a future deficiency balance is critical to rational economic decision making. *See, e.g.*, *Coxall v. Clover Comm. Corp.*, 781 N.Y.S.2d 567, 572 (N.Y. Civ. 2004) ("The purpose of the notice requirement is to give the debtor an opportunity to protect his interest in the collateral by exercising any right of

redemption or by bidding at the sale, to challenge any aspect of the disposition *before it is made*, or to interest potential purchasers in the sale, all to the end that the merchandise not be sacrificed by a sale at less than the true value.") (emphasis added).  If the notice is only required <u>if a</u> sale occurs, the post-repossession notice cannot help the debtor decide whether or not to redeem their vehicle, eviscerating the purpose of the provision.

However, at least two courts have concluded that, where a secured creditor does not sell a consumer's vehicle, the post-repossession, pre-sale notice requirements under Section 9-611 and 9-614 are not triggered.  *See, e.g.*, *Bremer Bank Nat. Ass'n v. Matejcek*, 916 N.W.2d 688, 697 (Minn. App. 2018) (rejecting claim that creditor failed to give appropriate pre-sale notice "because there was no sale of collateral by a secured party giving rise to the UCC's requirements for notice and a commercially reasonable disposition"); *Wallace v. Pinnacle Bank-Wyoming*, 275 P.3d 1250, 1256 (Wyo. 2012) ("The U.C.C. notice provision relied on by the [plaintiff] [Wyo. Stat. Ann. § 34.1–9–611(b)] applies only when property is disposed of after a default.") (emphasis added); *Chulsky v. First Niagara Bank*, No. MID-L-010770-14, (N.J. Super.), Transcript of Decision dated Feb. 23, 2016, p. 9 (dismissing New Jersey UCC claim because "the collateral was never disposed.").[5] And a full-day's research devoted to this singular topic, Plaintiff's counsel has not found a case which has been decided to the contrary.

In sum, for the portion of the Settlement Class whose vehicles were <u>not</u> sold or to whom GMF later sent a presale notice that included the phrase "fair market value" (approximately 1,636 individuals), there is a substantial risk they would not prevail in a claim for damages based on the allegedly-faulty post-repossession notice.  On the other hand, while still subjected to other

---

[5] A copy of the *Chulky* Transcript of Decision is attached as <u>Exhibit 2</u>.

litigation risks (as outlined below), the Class Members whose vehicles *were* sold do not share this same risk of non-recovery.

For these reasons, the larger amount of the benefits under the Settlement Agreement go to the members of the Settlement Class whose vehicles were sold, the Sale Subclass, as their claims are stronger and, consequently, should be valued more highly.  Under the Settlement Agreement, all Class Members receive either a $150 payment or account credit.  And each Sale Subclass member will receive an additional payment reflecting a pro-rata share of the net settlement proceeds based on his or her potential UCC damages; Plaintiff estimates that these payments will average approximately $712 (in addition to the $150 payment that will be provided as described above) per Sale Subclass member.  In addition, the Sale Subclass will receive $8.3 million in deficiency balance forgiveness, resulting a total settlement value of $11,250,000.

The total settlement value for Class Members whose vehicles were sold is approximately 41% of the potential UCC damages; the total settlement value for the entire Settlement Class  is 26% of the potential UCC damages.  Plaintiff submits this is reasonable given the risk of non-recovery to a large swath of the class (as set forth above), the risks outlined below that apply to all class members, and the settlements approved in other class actions.  *See*, *e.g.*, *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560 (N.D. Ill. 2011) (approving consumer class action settlement consisting of 10% of the potential damages); *Lazy Oil Co. v. Witco*, 95 F.Supp.2d 290, 339 (W.D.Pa.1997) (approving settlement amounting to 5.35% of damages for the entire class period, and 25.5% of damages within the limitations period); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civil No. 94–404 (W.D.Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages at $33 million); *In re Domestic Air Tranp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D.Ga.1993) (settlement approved representing 12.7% to 15.3% of

potential damages); *In re Newbridge Networks Sec. Litig.*, No. CIV. A. 94–1678–LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) (approving settlement and concluding that while "[c]ourts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; [ ] an agreement that secures roughly six to twelve percent of a potential trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness"); *In re Ravisent Techs., Inc. Sec. Litig.*, No. Civ.A.00-CV-1014, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses.") (internal citations omitted).

The value of the settlement is enhanced because GMF has agreed that, after preliminary approval, it will cease efforts to recover deficiency balances from Class Members.  Settlement Agreement, ¶ 4.1(d). *See, e.g.*, *Purdie v. Ace Cash Express, Inc.*, No. Civ. A. 301CV1754L, 2003 WL 22976611, at *2 (N.D. Tx. Dec. 11, 2003) (debt relief was particularly significant benefit because "continued collection efforts for unpaid loans [were] an enormous source of strain and stress" on class members).

GMF has also represented that effective July 18, 2018, it changed its post-repossession notices such that they now reference the "fair market value" language[6]  (the absence of which language forms the basis of this litigation), a factor that weighs in favor of approving the settlement.  *Little-King v. Hayt Hayt & Landau*, No. 11–5621 (MAH), 2013 WL 4874349, at

---

[6] *See* Settlement Agreement, ¶ 5.4.

*10-11 (D.N.J. Sept. 10, 2013) (noting that defendant ceased using allegedly unlawful debt collection letter as factor militating in favor of approving settlement).

      3.      **The Risk, Expense, Complexity, and Likely Duration of Further Litigation Militate In Favor Of Settlement Approval**

In addition to the risks unique to Class Members whose vehicles were <u>not</u> sold (outlined above), the entire class may recover nothing if this case proceeds. GMF filed a motion to dismiss all of Plaintiff's claims on the grounds that the Supreme Judicial Court's decision in *Williams v. American Honda Finance Corp.*, 479 Mass. 656 (2018), created a new rule that should not be applied retroactively. Further, GMF contended that application of the new rule would violate its due process rights under the Fourteenth Amendment of the U.S. Constitution. Plaintiff vehemently opposed GMF's arguments both in her written opposition to the Motion to Dismiss and at oral argument because, in her view, the SJC did not issue a "new rule," but simply applied a plain text reading of the UCC; decisional law is almost always applied retroactively; and because the statute was not so unclear that it was void for vagueness under the Fourteenth Amendment.

But, at the request of the parties, GMF's Motion to Dismiss remains undecided by this Court. If the Court rules in GMF's favor on either ground (retroactivity or due process), the Plaintiff's claims will fail and the class will recover nothing. This weighs considerably in favor of preliminarily approving the settlement, particularly because Class Members will receive a *certain* recovery in a reasonable amount of time (rather than potentially years from now after likely appeals by the losing party). *See*, *e.g.*, *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass 2000) (the certainty of recovery through settlement in contrast to the expense, length and uncertainty of litigation, is a strong argument in favor of settlement).

      4.      **The Experience and Views of Counsel Weigh In Favor Of Approval**

"When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Id.*

Here, Plaintiff's counsel are experienced in the litigation, certification, and settlement of class action cases similar to this case. *See* Exhibit 1, Affidavit of Plaintiff's Counsel. Plaintiff's counsel believes the settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class as a whole. *Id.* at ¶ 6. This factor favors Settlement approval.

### 5.   **The Proposed Attorneys' Fees Award Is Reasonable**

Fed. R. Civ. P. 23(h) provides that, "in a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." When awarding fees, the First Circuit has held that the "prevailing practice" is the "percentage of the fund" (POF) method, rather than counsel's lodestar. *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995). The First Circuit has reasoned that the POF method "enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency." *Id.* Under the latter approach, "attorneys not only have a monetary incentive to spend as many hours as possible (and bill for them) but also face a strong disincentive to early settlement." *Id.*, citing Third Circuit Report, 108 F.R.D. at 247–48 (finding that, in common fund cases, the lodestar method "encourag[es] lawyers to expend excessive hours" and "creates a disincentive for the early settlement of cases") (additional citation omitted). So, "[i]If the POF method is utilized, a lawyer is still free to be inefficient or to drag her feet in pursuing settlement options—but, rather than being rewarded for this unproductive behavior, she will likely reduce her own return on hours expended." *Id.*

While "the First Circuit has not set a presumptive benchmark for percentage of fund awards, other courts in the Circuit have noted that such benchmark has been between twenty to thirty-five percent." *Bacchi v. Massachusetts Mutual Life Insurance Company*,  No. 12-11280-DJC, 2017 WL 5177610, at *4 (D. Mass. Nov. 8, 2017), citing *Mazola v. May Dept. Stores Co.*, No. 97-cv-10872-NG, 1999 WL 1261312, at *4 (D. Mass. Jan. 27, 1999); *In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 172 (D. Mass. 2014).  To that end, at final approval stage, Plaintiff's counsel expects to petition the Court for an award of up to 25% of the cash component of the Settlement Fund (not the total settlement value), which falls within the range of reasonable POF fee awards in this Circuit.

## C.    The Proposed Incentive Award Is Reasonable.

Courts have widely recognized that incentive awards both promote enforcement of state and federal law by private individuals and encourage class action settlements. *See, e.g., In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 82 (D. Mass. 2005) ("incentive awards are recognized as serving an important function in promoting class action settlements").

At final approval, Plaintiff intends to petition the Court (and GMF has agreed to pay, separate and apart from the other consideration in the Settlement Fund) for an incentive payment of $5,000 for her service to the class, including rejecting an early class-wide settlement offer that would have netted her the same return but would have resulted in a much-less favorable result for the class.  Plaintiff submits that this incentive award is reasonable under the circumstances and is in line with other incentive awards approved in this Circuit.  *See*, *e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. at 82 (awarding $8,000 for each named consumer); *Scovil v. Fedex Ground Package Sys., Inc.*, No 10-cv-515-DBH, 2014 WL 1057079, at *7-8 (D. Me. March 14, 2014)

(noting a range of incentive awards in other cases and approving incentive awards from $15,000 to $20,000 to the various named plaintiffs).

**D.     The Proposed Notice Program Is Constitutionally Sound.**

Rule 23(e)(1) requires the Court to "direct notice in a reasonable manner to all class members who would be bound by" a proposed settlement. Fed. R. Civ. P. 23(e)(1); *see also* MCL 4th § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

According to the Manual for Complex Litigation, a settlement notice should: (1) define the class; (2) describe clearly the options open to the class members and the deadlines for taking action; (3) describe the essential terms of the proposed settlement; (4) disclose any special benefits provided to the class representatives; (5) indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to or opting out of the settlement; (6) explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations; (7) provide information that will enable class members to calculate or at least estimate their individual recoveries; and (8) prominently display the address and phone number of class counsel and the procedures for making inquiries. MCL 4th § 21.312.

The proposed form of notice, attached as Exhibit B to the Settlement Agreement ("Notice") satisfies all of the above criteria. The Notice is clear, straightforward, and provides persons in the Settlement Class with enough information to evaluate whether to participate in the settlement. Thus, the Notice satisfies the requirements of Rule 23. *Phillips Petroleum Co. v.*

*Shutts*, 472 U.S. 797, 808 (1985) (explaining a settlement notice must provide settlement class members with an opportunity to present their objections to the settlement).

The Settlement Agreement provides for direct notice via first-class mail. *Id.*, ¶ 7.2. The Notice constitutes the best notice practicable under the circumstances, provides due and sufficient notice to the Settlement Class, and fully satisfies the requirements of due process and Federal Rule of Civil Procedure 23.

**E.     Provisional Certification Of The Settlement Class And Sale Subclass Is Appropriate.**

For settlement purposes only, Plaintiff requests that the Court provisionally certify the Settlement Class and Sale Subclass because the applicable certification requirements are satisfied.

1.     <u>**The Rule 23(a) factors are met**</u>

a.     **Numerosity.**

A class should be certified when "the class is so numerous that joinder of all members is impracticable." Fed. R. 23(a)(1). Here, the Settlement Class consists of an estimated 3,949 persons and the Sale Subclass consists of an estimated 2,237. Consequently, numerosity is easily met. *See*, *e.g.*, In *re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) ("forty individuals [are] generally found to establish numerosity"); *Rodrigues v. Members Mtg. Co.*, 226 F.R.D. 147, 150 (D. Mass. 2005) (same).

b.     **Commonality.**

The commonality requirement of Rule 23(a)(2) is satisfied because there are many questions of law and fact common to the Settlement Class that focus on GMF's alleged common practice of sending consumers identical or substantial-similar post-repossession notices. *See*, *e.g.*, *Hale v. AFNI, Inc.*, 264 F.R.D. 402 (N.D. Ill. 2009) ("the commonality requirement is

normally satisfied when the defendant's 'standardized conduct' toward class members involves sending form letters") (citation omitted); *Lucas v. GC Services L.P.*, 226 F.R.D. 337, 341 (N.D. Ind. 2005) (holding that "Defendants' standardized conduct-both in sending of the form letters and the standardized documents themselves-the commonality requirement has been met"); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir.1998) ("[c]ommon nuclei of fact are typically manifest where ... the defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents").

### c.    **Typicality.**

To be typical within the meaning of the rule simply requires that the claims of the named plaintiff arise from the same type of conduct which gives rise to the class members' claims. *Burstein v. Applied Extrusion Technologies, Inc.*, 153 F.R.D. 488, 491 (D. Mass. 1994); *Adair v. Sorenson*, 134 F.R.D. 13, 17 (D. Mass. 1991); *Fletcher v. Cape Cod Gas Co.*, 394 Mass. at 606. Typicality is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 26 (D. Mass. 2003) (internal quotation marks and citation omitted).

Here, Plaintiff's claim is premised on the same conduct as the claims of proposed class members. Plaintiff and proposed class members each received the same or substantially similar post-repossession notices from GMF, and their claims arise under the same laws.  Therefore, the typicality requirement is met.

### d.    **Adequacy.**

The final Rule 23(a) prerequisite requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Adequacy is met where: (1) "the interests of the representative party will not conflict with the interests of the class members"; and (2) "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985)).

Here, Plaintiff has the same interests as the proposed class members—who all allegedly received insufficient post-repossession notices from GMF in violation of the UCC. Plaintiff is willing and able to prosecute this case, and has done so. Plaintiff does not have any interests that are antagonistic to the interests of the proposed class. Plaintiff's counsel are active practitioners with substantial experience in class action litigation, including UCC cases. *See* <u>Exhibit 1</u>, Affidavit of Plaintiff's Counsel.  The Rule 23(a) requirements are satisfied.

2.      **The Rule 23(b)(3) factors are satisfied**

Courts routinely find predominance of common questions where the claims relate to a common course of conduct. *Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (predominance requirement satisfied by "sufficient constellation of common issues [that] bind class members together" and "cannot be reduced to a mechanical, single-issue test").

Here, the common issues predominate because the central liability question in this case turns on the legality of identical or substantially-similar, form post-repossession notices GMF sent to Class Members.   *See*, *e.g.*, *Quiroz v. Revenue Production Mgmt., Inc.*, 252 F.R.D. 438, 444 (N.D.Ill.2008) (finding that predominance was satisfied where the common question was whether the defendant's form letter violated the FDCPA); *Piper v. Portnoff Law Associates*, 215 F.R.D. 495, 502 (E.D. Pa. 2003) (predominance met where "each member of the proposed class received substantially similar letters from the defendants and the factual and legal issues [were] identical").

Because the claims are being certified for purposes of settlement, there are no issues with manageability. *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial."). Additionally, resolution of thousands of claims in one action is far superior to individual lawsuits and promotes consistency and efficiency of adjudication. *See id.* at 617 (noting the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). Certification for purposes of settlement is appropriate.

## F.      Scheduling A Final Approval Hearing Is Appropriate.

The last step in the Settlement approval process is a final approval hearing at which the Court may hear all evidence and argument necessary to make its settlement evaluation. Proponents of the Settlement may explain the terms and conditions of the Settlement Agreement, and offer argument in support of final approval. The Court will determine at or after the final approval hearing whether the Settlement should be approved, and whether to enter a final order and judgment under Rule 23(e). Plaintiff requests that the Court set a date for a hearing on final approval at the Court's convenience, but no earlier than 90 days after entry of an order preliminarily approving the settlement and 30 days after the objection/exclusion deadline.

## IV.  CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court: (1) grant preliminary approval of the Settlement; (2) provisionally certify the proposed class and subclass; (3) appoint as Class Counsel the Law Office of Nicholas F. Ortiz, P.C.; (4) appoint Danika Hartwell as class representative; (5) approve the proposed notice plan; (6) appoint Optime

Administration LLC to serve as the Claims Administrator; and (7) schedule the final fairness

hearing at the Court's convenience but no earlier than 90 days following entry of the Preliminary

Approval Order and 30 days after the Exclusion/Objections deadline.

Respectfully submitted,

DANIKA HARTWELL,
By her attorneys,

/s/ Nicholas F. Ortiz_____
Nicholas F. Ortiz (BBO# 655135)
Raven Moeslinger (BBO# 687956)
Law Office of Nicholas F. Ortiz, P.C.
99 High Street, Suite 304
Boston, MA 02110
(617) 338-9400
rm@mass-legal.com

Date: April 12, 2019

## CERTIFICATE OF SERVICE

I, Nicholas F. Ortiz, hereby certify that today I caused to be served the within on counsel

for the defendant via ECF service.

/s/ Nicholas F. Ortiz_____