UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIKA HARTWELL, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>   v.<br><br>AMERICREDIT FINANCIAL SERVICES, INC. d/b/a GM FINANCIAL,<br><br>                Defendant. | NO. 1:18-CV-11895-DJC<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR ATTORNEYS' FEES AND COSTS** |

# I.  <u>INTRODUCTION</u>

Plaintiff Danika Hartwell ("Plaintiff" or "Ms. Hartwell"), individually and on behalf of the Settlement Class, respectfully seeks final approval of the Class Action Settlement Agreement ("Agreement" or "Settlement") reached with Defendant Americredit Financial Services, Inc. d/b/a GM Financial ("GMF"). On May 13, 2019, the Court preliminarily certified a Settlement Class consisting of 4,905 Settlement Class Members,[1] approved the issuance of class notice, and set a hearing on final approval on August 28, 2019. (ECF No. 37).

The Settlement seeks to resolve claims brought by Ms. Hartwell on behalf of herself and other similarly-situated consumers against GMF for alleged violations of the Massachusetts Uniform Commercial Code, M.G.L. c. 106, § 9-600, *et seq*.  ("UCC") and the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 2, et seq ("Chapter 93A"). The Settlement establishes a common fund of $2,945,400 in cash and certain credits, and provides Settlement Class Members with approximately $8.4 million in deficiency debt forgiveness, a total settlement value of approximately $11,400,000. The Settlement is attached hereto as <u>Exhibit 1</u>.

On June 3, 2019, the class administrator, Optime Administration LLC ("Administrator"), sent a copy of the Court-approved form of notice to all Settlement Class Members. *See* <u>Exhibit 2</u>, Affidavit of Administrator, ¶ 4. The Administrator sent 4,905 Class Notices to Settlement Class Members. A total of 4,694, or 95.7 percent, of those Class Notices were successfully delivered. *Id.* at ¶¶ 4, 5. No Settlement Class Member has objected to any portion or term of the Settlement.

---

[1] There are 3,909 accounts subject to this Settlement. Section 1.2 of the Settlement defines "Members" on an account basis, meaning that if there are multiple obligors on an account, the obligors are defined as one Member and the settle proceeds associated with the claim will be shared equally among the obligors. However, each obligor is a "Settlement Class Member," Settlement §1.25.  When accounting for all obligors, the class consists of 4,905 individuals.

*Id.* at ¶ 5. In addition, only six Settlement Class Members have sought to exclude themselves from the Settlement.[2]

As set forth more fully herein, this low opt-out rate, coupled with the lack of objections, underscores the bottom line: This Settlement is a good deal for the Class. The Plaintiff submits that the Settlement is fair, reasonable, and adequate, as it provides substantial benefits to Settlement Class Members, especially given the complexity of the case, potential recovery, possible appellate issues, and the general risks of any litigation. The Plaintiff further submits that the attorneys' fees, litigation expenses, and incentive award are fair and reasonable.

For the reasons set forth below, Plaintiff requests that the Court grant approval of this Settlement pursuant to Fed. R. Civ. P. 23(e) and enter the proposed Final Approval Order attached here to as Exhibit 3.

## II.  STATEMENT OF THE CASE

Ms. Hartwell commenced this class action against GMF on behalf of herself and other similarly situated consumers for alleged violations of the Massachusetts Uniform Commercial Code, M.G.L. c. 106, § 9-600, *et seq*. ("UCC") and Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 2, *et seq* ("Chapter 93A"). Ms. Hartwell alleges that GMF violated the UCC by sending her and other similarly-situated consumers post-repossession notices that failed to comply with the UCC because they described consumers' deficiencies as the difference between the proceeds from the sale of the collateral – rather than its fair market value – and their outstanding loan[3] balances.

---

[2] Of the 14 opt-out forms submitted, at least eight were submitted in error by Class Members intending to opt *into* the Settlement. As set forth in the Plaintiff's Assented-to Motion to Strike Certain Opt Outs (ECF. No. 42), among those eight unintended opt-outs are two facially-invalid opt outs.

[3] Settlement Class Members are indebted pursuant to Retail Installment Sale Contracts. The term "loan" is used in this memorandum for convenience.

On July 17, 2018, Plaintiff sent GMF a demand letter pursuant to M.G.L. c. 93A, § 9 and filed a complaint in Massachusetts Superior Court, alleging that GMF violated the UCC.  On September 5, 2018, GMF removed the case to this Court.  (ECF No. 1). On September 18, 2018, after receiving an extension from Plaintiff, GMF responded to the Demand Letter with a settlement offer.  Plaintiff subsequently filed a motion to remand on October 5, 2018.  (ECF No. 8). The Court denied the motion on November 14, 2018.  (ECF No. 13). On November 28, 2018, Plaintiff filed an amended complaint, adding a class claim under Chapter 93A.  (ECF No. 16). And on December 6, 2018, Plaintiff rejected GMF's settlement offer and made a counter-offer.

On December 28, 2018, GMF filed a motion to dismiss all claims in Plaintiff's Complaint (the "Motion to Dismiss"), arguing that the Supreme Judicial Court's decision, *Williams v. American Honda Finance Corp.*, 479 Mass. 656 (2018), should only apply prospectively.  (ECF No. 24).  Plaintiff briefed this novel issue in opposition, and GMF replied.  (ECF Nos. 26, 27). The Court held a hearing on February 13, 2019.  (ECF No. 30).  After oral argument, the parties conferred, began to negotiate settlement in earnest, and jointly asked the Court to stay its decision on the Motion to Dismiss so that they could complete these negotiations. The parties filed a Notice of Settlement Negotiations on February 25, 2019.  (ECF No. 31).

The parties were ultimately able to reach the Settlement that is now before the Court for final approval. On April 12, 2019, the Plaintiff filed her Assented to Motion for Preliminary Approval of Class Action Settlement and for Certification of Settlement Class ("Motion for Preliminary Approval"). (ECF No. 34). The Court granted the Motion for Preliminary Approval on May 13, 2019, provisionally certifying the Settlement Class, approving the issuance of notice of the Settlement to Settlement Class Members, and setting a hearing on final approval of the Settlement for August 28, 2019. (ECF No. 37).

### III.  **THE TERMS OF THE SETTLEMENT**

The terms of the parties' Settlement are contained within the Class Action Settlement

Agreement (the "Settlement Agreement") attached as <u>Exhibit 1</u>. The following points summarize

the Settlement Agreement's key terms:

1) *The Settlement Class and Sale Subclass*: The Settlement Class is comprised of: All accounts subject to a Retail Installment Contract ("RISC") with respect to which GMF sent a notice identical and/or substantially similar to the notice attached as <u>Exhibit A</u> to Plaintiff's Amended Complaint (ECF No. 16), at any time between July 19, 2014 through July 17, 2018, excluding: (i) any account that includes within the applicable RISC, a provision requiring either party to submit to binding non-class arbitration, (ii) any account an obligor of which received a discharge in bankruptcy after the date he or she received such a notice, and (iii) any account where GMF has previously obtained a binding release from all obligors or obtained a judgment against all obligors;

The Sale Subclass is comprised of: All accounts within the Settlement Class where GMF repossessed or accepted voluntary surrender of the subject vehicle and then sold, leased, licensed or otherwise disposed that vehicle without sending a presale notice that explained that any potential deficiency would be based on the vehicle's "fair market value" prior to such sale or other disposition.[4]

2) *The Settlement Relief*: First, each Settlement Class Member will be paid or credited $150. Settlement Class Member will receive $150 in cash, unless they redeemed or reinstated their loan with GMF and have a loan balance that exceeds $150: In the latter case, the Settlement Class Member will receive a statement credit of $150 from GMF.[5] Agreement, ¶¶ 1.20, 1.23, 1.24, 4.1. The Settlement Agreement also requires GMF to pay a total of $2,359,050 to Sale Subclass Members (in proportion to their total potential damages by account under the UCC, M.G.L. c. 106, § 9-625) and forgive their post-repossession loan deficiencies. *Id*. at ¶¶ 1.17, 4.1, 5.1, 8.1. In total, Settlement Class Members will receive $2,945,400 in cash and credits, net of fees and administrative costs; and approximately $8.4 million in deficiency debt forgiveness. These sums will be distributed by the Administrator.

3) *Plaintiff's Incentive Award*: Plaintiff asks the Court to approve an incentive award of $5,000 for Ms. Hartwell, to be paid separately from the Settlement Fund.  Agreement, ¶ 4.4. This award will compensate Plaintiff for her time and effort serving as class representative and for

---

[4] As set forth below, this subclass is based on an important legal distinction, as it separates those claims subject to a defense under the UCC (those class members whose vehicles were <u>not</u> sold by GMF) from those with claims not subject to that defense (those whose vehicles <u>were</u> sold).

[5] During the notice period, some Settlement Class Members may have paid off their loan or paid amounts such that their remaining balance will be less than $150.00 after Final Approval.  GMF has agreed to update the Class List for the purpose of identifying accounts that have balances less than $150.00, so that those accounts will receive cash rather than a credit. As of the date that the class list was generated, it appeared that approximately 983 Settlement Class Members, by Account, were eligible to receive the statement credit and 2,996 Settlement Class Members were eligible to receive cash.

the risks she undertook in prosecuting the case. GMF will make this payment separate and apart from the Settlement Fund.

4) *Attorneys' Fees and Litigation Expenses:* The Settlement Agreement provides that Class Counsel may request that the Court approve an award of attorneys' fees and litigation expenses. *Id.* ¶ 4.5. Plaintiff's counsel now applies for an attorneys' fees and costs award of 25 percent of the Settlement Cash Amount, see *Id.* ¶ 1.22, $736,350. Class Counsel is not seeking a common fund fee recovery from the statement credit or deficiency forgiveness portion of the Settlement. When the total settlement value is compared with the applied-for attorneys' fees and costs, those fees and costs are approximately 6.5 percent of the total settlement value.

5) *Cy Pres:* As set forth in the Agreement, 130 days after the Distribution Date, residual funds, if any, will be split equally and paid over to the two *cy pres* recipients, to the National Consumer Law Center, Inc. and the Jump$tart Coalition for Personal Financial Literacy. Agreement, ¶ 6.5.

## IV.  ARGUMENT

**A.      The Proposed Settlement Is Fair And Reasonable.**

Under Federal Rule of Civil Procedure 23(e)(2), a class action settlement must be "fair, reasonable, and adequate" to be approved.  The First Circuit has not adopted a particular test for determining the reasonableness of a class settlement, but some district courts have borrowed tests from other circuits.  For example, some have relied on the Second Circuit's "Grinnell" test, which examines several factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[6]

---

[6] *Roberts v. TJX Companies, Inc.*, No. 13-cv-13142-ADB, 2016 WL 8677312, at *6 (D. Mass. Sept. 30, 2016), quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

But, while "[t]he case law offers 'laundry lists of factors' pertaining to reasonableness, […] 'the ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement.'" *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015), quoting *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir.2009). "[T]he district court enjoys considerable range in approving or disapproving a class settlement, given the generality of the standard and the need to balance [a settlement's] benefits and costs." *Nat'l Ass'n of Chain Drug Stores*, 582 F.3d at 45.

Moreover, "[t]he proponents of a class settlement can obtain 'a strong initial presumption that the compromise is fair and reasonable' by establishing that the settlement was reached after arms-length negotiations, that the proponents' attorneys have experience in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small." *Rolland v. Cellucci*, 191 F.R.D. 3, 6 (D. Mass. 2000), quoting *Galdi Sec. Corp. v. Propp*, 87 F.R.D. 6, 9 (S.D.N.Y.1979)

Finally, the First Circuit has long recognized a strong public interest in favor of settling class actions. *See Lazar v. Pierce*, 757 F.2d 435, 439 (1st Cir. 1985) ("…we should point to the overriding public interest in favor of the voluntary settlement of disputes, particularly where class actions are involved…").

As set forth below, the relevant factors here uniformly support approval of the Settlement.

1. **The Settlement Provides Substantial Benefits To Class Members Given The Complexity Of The Case, Potential Recovery, And Risks Of Litigation.**

The Settlement Agreement requires GMF to pay cash and statement credits in the amount of $2,945,400 and to provide approximately $8.4 million in deficiency balance loan forgiveness, resulting in a total settlement value of $11,400,000.  In comparison, the potential damages under the UCC for the Settlement Class are approximately:  $17.5 million for individuals whose vehicles were <u>not</u> sold or were sold after GMF sent a later presale notice that included the phrase "fair market value"; and $26.8 million for individuals whose vehicles <u>were</u> sold.  As set forth in the Memorandum in Support of Plaintiff's Motion for Preliminary Approval, Settlement Class Members whose vehicles were <u>not </u>sold face a serious risk they could not prevail in a claim for damages based on the allegedly-faulty post-repossession notice.[7] On the other hand, while still subjected to other litigation risks (as outlined below), Settlement Class Members whose vehicles <u>were</u> sold are not subject to this defense. For these reasons, the larger amount of the benefits under the Settlement Agreement go to Sale Subclass Members.

Under the Settlement Agreement, all Class Members receive either a $150 payment or an account credit.  Sale Subclass Members will receive an additional payment of the net settlement proceeds based on their potential UCC damages; Plaintiff estimates that these payments will average approximately $712 (in addition to the $150 payment that will be provided as described above) per Sale Subclass Member. In addition, the Sale Subclass Members will receive $8.3 million in deficiency balance forgiveness.

---

[7] At least two courts have concluded that, where a secured creditor does not sell a consumer's vehicle, the post-repossession, pre-sale notice requirements under Section 9-611 and 9-614 are not triggered.  *See, e.g.*, *Bremer Bank Nat. Ass'n v. Matejcek*, 916 N.W.2d 688, 697 (Minn. App. 2018) (rejecting claim that creditor failed to give appropriate pre-sale notice "because there was no sale of collateral by a secured party giving rise to the UCC's requirements for notice and a commercially reasonable disposition"); *Wallace v. Pinnacle Bank-Wyoming*, 275 P.3d 1250, 1256 (Wyo. 2012) ("The U.C.C. notice provision relied on by the [plaintiff] [Wyo. Stat. Ann. § 34.1–9–611(b)] applies only when property is disposed of after a default.") (emphasis added); *Chulsky v. First Niagara Bank*, No. MID-L-010770-14, (N.J. Super.), Transcript of Decision dated Feb. 23, 2016, p. 9 (dismissing New Jersey UCC claim because "the collateral was never disposed."). After a full-day's research devoted to this topic alone, Plaintiff's counsel has not found a case which has been decided to the contrary.

The total settlement value for Class Members whose vehicles were sold is approximately 41 percent of the potential UCC damages; the total settlement value for the entire Settlement Class is 26 percent of the potential UCC damages.  Plaintiff submits this is reasonable given the risk of non-recovery to a large swath of the Class, the risks outlined below that apply to all class members, and the settlements approved in other class actions.  *See, e.g.*, *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560 (N.D. Ill. 2011) (approving consumer class action settlement consisting of 10 percent of the potential damages); *Lazy Oil Co. v. Witco*, 95 F.Supp.2d 290, 339 (W.D.Pa.1997) (approving settlement amounting to 5.35 percent of damages for the entire class period, and 25.5 percent of damages within the limitations period); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civil No. 94–404 (W.D.Pa. Dec. 23, 1996) (approving settlement of 10.9 percent of estimated damages).[8]

The value of the settlement is enhanced because GMF has agreed that it will cease efforts to recover deficiency balances from Sale Subclass Members.  Settlement Agreement, ¶ 4.1(d).  *See, e.g.*, *Purdie v. Ace Cash Express, Inc.*, No. Civ. A. 301CV1754L, 2003 WL 22976611, at *2 (N.D. Tx. Dec. 11, 2003) (debt relief was particularly significant benefit because "continued collection efforts for unpaid loans [were] an enormous source of strain and stress" on class members). GMF has also represented that effective July 18, 2018, it changed its post-repossession notices such that they now reference the "fair market value" language[9]  (the absence

---

[8] *See also In re Domestic Air Tranp. Antitrust Litig.,*148 F.R.D. 297, 325 (N.D.Ga.1993) (settlement approved representing 12.7 percent to 15.3 percent of potential damages); *In re Newbridge Networks Sec. Litig.*, No. CIV. A. 94–1678–LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("an agreement that secures roughly six to twelve percent of a potential trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness"); *In re Ravisent Techs., Inc. Sec. Litig.*, No. Civ.A.00-CV-1014, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2 percent of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5 percent and 6.2 percent of the class members' estimated losses" (internal citations omitted)).
[9] *See* Settlement Agreement, ¶ 5.4.

of which language forms the basis of this litigation), a factor that weighs in favor of approving the settlement. *Little-King v. Hayt Hayt & Landau*, No. 11–5621 (MAH), 2013 WL 4874349, at *10-11 (D.N.J.  Sept. 10, 2013) (noting that defendant ceased using allegedly unlawful debt collection letter as factor militating in favor of approving settlement).

In addition to the risks unique to Settlement Class Members whose vehicles were not sold, the entire class may recover nothing if this case continues.  GMF filed a motion to dismiss all of Plaintiff's claims positing that the Supreme Judicial Court's decision in *Williams v. American Honda Finance Corp.*, 479 Mass. 656 (2018), created a new rule of law and should not be applied retroactively. Further, GMF contended that applying *Williams* to this case would violate its due process rights under the Fourteenth Amendment of the U.S. Constitution.  Plaintiff disagrees with GMF and explained the reasons for that disagreement in her written opposition to the Motion to Dismiss and at oral argument.  In summary, the Plaintiff argues that the SJC did not issue a "new rule," but simply read the plain text of the UCC and M.G.L. c. 255B § 20B ("RISA") together, and so just like any other interpretation of a Massachusetts statute by the SJC, *Williams* simply tells us what the statute means and has meant since the moment it was enacted. The Plaintiff also argues that the UCC and RISA were not unconstitutionally void for vagueness.  But, while Plaintiff remains steadfast in her position, one Superior Court judge has ruled that the *Williams* decision applies *only* prospectively, dismissing a UCC claim that is identical to the one before this Court.  *See Dellorusso v. PNC Bank NA*, No. 1877CV01475 (Essex Sup. Ct. May 3, 2019).[10]

At the request of the parties, GMF's Motion to Dismiss remains undecided by this Court. If the Court rules in GMF's favor on either ground (retroactivity or due process), the Plaintiff's

---

[10] The Plaintiff in *Dellorusso* is appealing the decision.

claims will fail, and the class will recover nothing.  This weighs strongly in favor of approving the settlement, particularly because Class Members will receive a *certain* recovery in a reasonable amount of time (rather than potentially in years after the uncertain path of litigation and appeals).  *See*, *e.g.*, *Rolland*, *supra*, at 10 (the certainty of recovery through settlement in contrast to the expense, length and uncertainty of litigation, is a strong argument in favor of settlement).

### 2.  The Experience and Views of Counsel Weigh In Favor Of Approval.

"When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Gulbankian v. MW Mfrs., Inc.*, No. 10–10392–RWZ, 2014 WL 7384075, at *3 (D. Mass. 2014), quoting *Rolland*, supra, at 10.

Based on their review and analysis of the relevant facts and legal principles, Ms. Hartwell and her counsel believe that, in consideration of all the circumstances and after prolonged and serious arm's-length settlement negotiations with GMF's counsel, the terms and conditions of the Settlement are fair, reasonable, and adequate, and beneficial to and in the best interests of Ms. Hartwell and the Settlement Class. Class counsel has extensive experience with complex litigation and class actions, s*ee* Exhibit 4, Affidavit of Plaintiff's Counsel, and he believes this settlement is fair, reasonable, adequate, and in the best interest of Settlement Class Members.

### B.  All Settlement Class Members Were Given Proper And Reasonable Notice Of The Settlement And No Class Members Objected To The Settlement.

The Settlement provided reasonable and adequate notice to Class Members. Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974), (citation omitted).

After the Court granted Motion for Preliminary Approval, the Administrator sent a copy of the Court-approved form of Class Notice to 4,905 Settlement Class Members. Exhibit 2, Affidavit of Administrator, ¶ 4. On June 3, 2019, the Notices were sent to Settlement Class Members by first-class mail using the most current addresses for Settlement Class Members available from GMF's records. *Id*.; *Reppert v. Marvin Lumber & Cedar Co., Inc.*, 369 F.3d 53, 56-57 (1st Cir. 2004) (sending notice by first class mail to class members identifiable by reasonable means is adequate notice). Thereafter, when notice packets were returned as undeliverable, the Administrator obtained updated addresses and re-mailed the notice packets to the updated addresses. *Id*. at 5. To date, of the 4,905 Class Notices mailed, a total of 4,694, or 95.7 percent, were successfully delivered. *Id.* at 5. This is a legally-adequate and fair level of successful notice. *See*, *e.g.*, *Bussie v. Allmerica Financial Corp.*, No. 97–40204–NMG, 2006 WL 8201933, at *1 (D. Mass. 2006) (approving settlement where "less than seven percent of the total [notices] were returned as undeliverable").

Class Counsel has filed a Verified Opt-Out Report with the Court. (ECF No. 41, "Opt-Out Report"). No Settlement Class Members have objected to the settlement terms. *Administrator Affidavit*, ¶ 6. Opt-out forms were submitted by 14 Settlement Class Members. *Id.* at 6.  As is usual in a class action settlement, some class members confuse an opt-out form for a claim form. Class Counsel suspected that this occurred here and inquired of the opt-out Settlement Class Members. The results of that investigation are detailed in the Opt-Out Report. As the Opt-Out Report details, ¶¶ 3-4 (Ortiz) and ¶¶ 2-6 (Hagen), eight opt-outs were unintended in the sense that those Settlement Class Members completed the form in the mistaken belief that, by so doing, they would be part of the Settlement, instead of excluded from it. Moreover, of the eight unintended opt outs, two are invalid because each does not include the signature of the co-

obligor on the account (in addition to being "unintended"). The Plaintiff has therefore filed a motion to invalidate these eight opt-outs. (ECF No. 42).

## C.     The Settlement Class Is Appropriately Certified.

For the reasons set forth more fully in the Memorandum in Support of Plaintiff's Motion for Preliminary Approval, all of the Fed. R. Civ. P. 23 requirements are met in the settlement class for which the Plaintiff requests certification.

### 1. <u>Numerosity</u>

The Settlement Class consists of 4,905 Settlement Class Members. Numerosity is easily satisfied.  *See, e.g.*, In *re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) ("forty individuals [are] generally found to establish numerosity").

### 2. <u>Commonality</u>

The commonality requirement of Rule 23 is satisfied because the questions of law and fact in this case all flow from GMF's practice of sending consumers identical or substantial-similar post-repossession notices.  When numerous people receive a notice that allegedly violates each's rights in the same way, common questions are at the heart of the case. *See, e.g., Kaminski v. Shawmut Credit Union*, 416 F. Supp. 1119, 1122-1123 (D. Mass. 1976) (common question exist where all bank customers were given the same form and were treated in identical manner by bank); *Hale v. AFNI, Inc.*, 264 F.R.D. 402 (N.D. Ill. 2009) ("the commonality requirement is normally satisfied when the defendant's 'standardized conduct' toward class members involves sending form letters") (citation omitted).[11]

---

[11]*See also Lucas v. GC Services L.P.*, 226 F.R.D. 337, 341 (N.D. Ind. 2005) (holding that "Defendants' standardized conduct-both in sending of the form letters and the standardized documents themselves-the commonality requirement has been met"); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir.1998) ("[c]ommon nuclei of fact are typically manifest where ... the defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents").

**3.** **Typicality**

To meet the typicality requirement, Plaintiff must demonstrate that her injuries arise from the same course of conduct as the rest of the class, and that her claims are based on the same legal theories as those of the class. *See*, *e.g.*, *Adair v. Sorenson*, 134 F.R.D. 13, 17 (D. Mass 1991) (claims are typical when plaintiff's injuries arise from "the same events, practice or course of conduct of the defendant as do the injuries which form the basis of the class claims"). Plaintiff and Settlement Class Members each received the same or substantially similar post-repossession notices from GMF, and their claims arise under the same laws.  There is nothing atypical about the Plaintiff's claim when compared with those of other Settlement Class Members. All received the same or substantially-similar form notice, and all have the same claim for damages arising under the UCC and Chapter 93A. Therefore, the typicality requirement is met.

**4.** **Adequacy**

The Plaintiff and Class Counsel have and will "fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4). Adequacy is met where: (1) "the interests of the representative party will not conflict with the interests of the class members"; and (2) "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985); *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) ("[t]he Court must determine, first, whether any potential conflicts exist between the named plaintiffs and the prospective class members, and, second, whether the named plaintiffs and their counsel will prosecute their case vigorously." (internal quotations and citations omitted)).

Here, Plaintiff has the same interests as the proposed class members—who all allegedly received insufficient post-repossession notices from GMF in violation of the UCC. Plaintiff and

her counsel are willing and able to vigorously prosecute this case, and have done so. Plaintiff does not have any interests that are antagonistic to or in conflict with the interests of the proposed class. Plaintiff's counsel are active practitioners with substantial experience in class action litigation, including UCC cases.  *See* Exhibit 4, Affidavit of Plaintiff's Counsel.

## 5.  **Predominance**

Courts have routinely found predominance of common questions where the claims relate to a common course of conduct. *See e.g., Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (predominance requirement satisfied by "sufficient constellation of common issues [that] bind class members together" and "cannot be reduced to a mechanical, single-issue test").

Here, the common issues predominate because the central liability question in this case turns on the legality of identical or substantially-similar, form post-repossession notices GMF sent to Class Members.  *See*, *e.g.*, *Quiroz v. Revenue Production Mgmt., Inc.*, 252 F.R.D. 438, 444 (N.D.Ill.2008) (finding that predominance was satisfied where the common question was whether the defendant's form letter violated the FDCPA).[12]  Thus, the predominance requirement is satisfied.

## 6.  **Superiority**

Finally, a class action is the superior method for addressing these claims. The superiority test ensures that "resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing

---

[12] *See also Piper v. Portnoff Law Associates*, 215 F.R.D. 495, 502 (E.D. Pa. 2003) (predominance met where "each member of the proposed class received substantially similar letters from the defendants and the factual and legal issues [were] identical").

procedural fairness or bringing about other undesirable results.'" *Glass Dimensions, Inc.* 285 F.R.D. at 180, *citing Relafen,* 218 F.R.D. at 346.

Here, each Settlement Class Member's claim is small relative to the cost of individual litigation, making it uneconomic for individuals to pursue these claims on their own, and therefore unlikely they will do so. *Grace v. Perception Tech., Inc.*, 128 F.R.D. 165, 171 (D. Mass. 1989); *Randle v. SpecTrain*, 129 F.R.D. 386, 393 (D. Mass. 1988). Moreover, most Settlement Class Members are unlikely to even be aware that they have a claim. Absent a class action, these claims might never be brought at all.  And because the claims are being certified for purposes of settlement, there are no issues with manageability. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."). Additionally, resolution of thousands of claims in one action is far superior to individual lawsuits and promotes consistency and efficiency of adjudication. *See id.* at 617 (noting the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights") (citation omitted).

Accordingly, for the foregoing reasons, certification for purposes of settlement is appropriate.

**D.     The Proposed Attorneys' Fees Award Is Reasonable And No Class Members Have Objected To The Fees.**

Class Counsel seeks an award of reasonable attorneys' fees and costs of $736,350, which represents 25 percent of the cash and credit component of the Settlement or approximately 6.5 percent of the total settlement value obtained for the class, to compensate and reimburse them for the work already performed in this case, the work remaining to be performed in connection with

the Settlement, and for the risk associated with prosecuting this case on a contingent-fee basis. This is an amount routinely approved by courts.

When awarding fees from a common fund, the First Circuit has held that the "prevailing practice" is the "percentage of the fund" (POF) method, rather than counsel's lodestar. *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995). The First Circuit has reasoned that the POF method "enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency." *Id.* Under the latter approach, "attorneys not only have a monetary incentive to spend as many hours as possible (and bill for them) but also face a strong disincentive to early settlement." *Id.*, citing Third Circuit Report, 108 F.R.D. at 247–48 (finding that, in common fund cases, the lodestar method "encourag[es] lawyers to expend excessive hours" and "creates a disincentive for the early settlement of cases") (additional citation omitted). So, "[i]If the POF method is utilized, a lawyer is still free to be inefficient or to drag her feet in pursuing settlement options—but, rather than being rewarded for this unproductive behavior, she will likely reduce her own return on hours expended." *Id*.

Moreover, percentage of the common fund fee recoveries recognize and encourage attorneys to provide contingency fee representation to consumers who cannot afford to pay attorneys by the hour. As is normal in consumer protection cases, and class actions in particular, Plaintiff's Counsel accepted this case on a full contingent fee, receiving no payment up front and bearing all the staff salaries, litigation costs, and risks associated with litigating the case. Despite investing significant time and resources into a case, attorneys undertaking consumer cases on a contingent-fee basis risk receiving nothing when a case is unsuccessful, or when a defendant becomes insolvent or uncollectable. Consequently, this type of practice may only viably vindicate consumer rights if those attorneys are able to recover their full contingency for their

successful cases. *See, e.g., Macedonia Church v. Lancaster Hotel, LP*, No. 05–0153 (TLM), 2011 WL 2360138, at *14 (D. Conn. June 9, 2011) ("the attorneys' fees requested [are] entirely contingent upon success. Proposed Class Counsel risk[s] time and effort and advance[s] costs and expenses, with no ultimate guarantee of compensation"); *Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate").

This is particularly important here given Plaintiff commenced this action, in part, under the Massachusetts Consumer Protection Act, G.L. c. 93A.  Granting counsel their requested fees helps ensure that contingency-fee arrangements remain easily-accessible to consumers deprived of the important consumer protections contained in the statute.  *See Barron v. Fidelity Magellan Fund*, 57 Mass.App.Ct. 507, 643 (2003) ("[w]e have long recognized that the award of attorney's fees and costs in consumer actions can be essential to the enforcement of G.L. c. 93A and the important public policy which it serves").

Here, the requested percentage – 25% of the cash component of the settlement (or 6.5 percent of its total value) – falls within the "benchmark" of common fund fee awards.  While "the First Circuit has not set a presumptive benchmark for percentage of fund awards, other courts in the Circuit have noted that such benchmark has been between twenty to thirty-five percent." *Bacchi v. Massachusetts Mutual Life Insurance Company*, No. 12-11280-DJC, 2017 WL 5177610, at *4 (D. Mass. Nov. 8, 2017) (citing *Mazola v. May Dept. Stores Co.*, No. 97-cv-10872-NG, 1999 WL 1261312, at *4 (D. Mass. Jan. 27, 1999)); *In re Neurontin Marketing and Sales Practices Litigation*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (citing study that nearly two-

thirds of class action fee awards based on the percentage method were between 25 percent and 35 percent of the common fund; and noting that in the First Circuit mean was 27 percent and median was 25 percent); *Bacchi v. Massachusetts Mutual Life Insurance Company*, No. 12-11280-DJC, 2017 WL 5177610, at *5 (D.Mass. Nov. 8, 2017); (awarding fees of 25 percent of commons fund); *Roberts v. TJX Companies, Inc.*, 2016 WL 8677312, at *13 (D. Mass. 2016) (awarding fees of one-third of common fund); *Applegate v. Formed Fiber Techs.*, LLC, No. 10-473, 2013 U.S. Dist. LEXIS 166171, at *3 (D. Me. Nov. 21, 2013) (awarding 1/3 of settlement fund); *In re StockerYale, Inc. Sec. Litig.*, No. 1:05cv00177-SM, 2007 U.S. Dist. LEXIS 94004, at *21 (D.N.H. Dec. 18, 2007) (approving award of one-third of common fund).

Moreover, no Settlement Class Member has objected to the requested fee. *See, e.g.*, *Kingsborough v. Sprint Communications Co., L.P.*, No. 14–12049–NMG, 2015 WL 1605506, at *3 (D. Mass. 2015) ("[t]he absence of objection by class members to Settlement Class Counsel's fee-and-expense request further supports a finding that it is reasonable"). For this reason, and the others outlined herein, Class Counsel requests that the Court award the fee in the requested amount.

**E.     The Proposed Incentive Award Is Reasonable.**

Finally, GMF has agreed to pay Ms. Hartwell an additional $5,000 incentive award, separate and apart from the other consideration in the Settlement Fund. "Plaintiffs in class and collective actions play a crucial role in bringing justice to those who may otherwise have no access to judicial enforcement of their rights." *Lauture v. A.C. Moore Arts & Crafts, Inc.*, No. 17-cv-10219-JGD, 2017 WL 6460244, at *2 (D.Mass., 2017). "Incentive awards serve to promote class action settlements by encouraging named plaintiffs to participate actively in the litigation in

exchange for reimbursement for their pursuits on behalf of the class overall." *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 352 (D. Mass.), aff'd, 809 F.3d 78 (1st Cir. 2015).

In this case, the class representative plaintiff has contributed substantially to this litigation and has invested considerable time, at her own expense, to do so. Plaintiff aided Class Counsel's initial investigation of the claims and worked to provide a variety of documentation to support the asserted claims on behalf of the Class. In addition, Ms. Hartwell rejecting an early Class-wide settlement offer, instead pressing forward to ensure that the class received a more favorable result.  The incentive award is further justified because it will encourage people to come forward and perform the important service of acting as a class representative in future cases.

Moreover, comparisons to incentive awards in other similar class action settlements demonstrate that this amount is reasonable and fair. *See Id.* at 82 (awarding $8,000 to $14,000 for each named plaintiff); *Brenner v. J.C.Penney Company, Inc.*, No. 13-cv-11212 (D. Mass.) (Docket No. 38) (incentive award of $5,000); *In re Lupron Mktg. & Sales Practices Litig.,* 228 F.R.D. at 98 (approving incentive payments of $5,000 and $25,000); *In re Celexa*, at *10 (incentive payments of $10,000 to each class representative); *Scovil v. Fedex Ground Package Sys., Inc.*, No 10-cv-515-DBH, 2014 WL 1057079, at *7-8 (D. Me. March 14, 2014) (awards from $15,000 to $20,000 to named plaintiffs).  Therefore, the requested incentive award is reasonable, and Class Counsel requests that the Court approve it.

## V.  <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that this Court approve the Settlement Agreement. Specifically, Plaintiff requests that the Court enter the proposed Final Approval Order attached to this motion as <u>Exhibit 3</u>.

Respectfully submitted,

DANIKA HARTWELL,
By her attorneys,


/s/ Nicholas F. Ortiz
Nicholas F. Ortiz (BBO# 655135)
Raven Moeslinger (BBO# 687956)
Law Office of Nicholas F. Ortiz, P.C.
99 High Street, Suite 304
Boston, MA 02110
(617) 338-9400
nfo@mass-legal.com
rm@mass-legal.com
sco@mass-legal.com

Date: August 21, 2019

## CERTIFICATE OF SERVICE

I, Nicholas F. Ortiz, hereby certify that today I caused to be served the within on counsel for the defendant via ECF service.

/s/ Nicholas F. Ortiz